Nelson, J.,
delivered the opinion of the Court.
On the 3rd day of December, 1867, Henry Page, a free man of color, bought of complainant three slaves, said to be his wife and two children, at the price of $3,200, and took a bill of sale from complainant. Henry paid part of the purchase money, and was to pay the residue in one, two and three years; and having absconded privately and left the country, and gone to parts unknown, as the bill alleges, this attachment bill charging that there was a balance due of $1,550, was filed against *655 bim and others, on the 21st day of January, 1861, for the purpose of subjecting certain debts due him, and certain real and personal estate, to the satisfaction of said demand.
Attachments were duly levied by the Deputy Sheriff of Smith and the Sheriff of DeKalb counties, in the month of January, 1861.
Publication was duly made and judgment pro confesso entered against Henry Page and others. An answer was filed by H. Y. Riddle, B. W. Harris and J. D. "White, and on the 21st day of August, 1865, the death of Henry Page was proved, and publication made as to his heirs, whose names and places of residence were said to be unknown.
Without minutely tracing all the steps preliminary to a' final hearing of the causes, or detailing the various provisions of the decrees therein, it is sufficient for the purposes of this opinion to state, that on the 20th of February, 1866, a decree was rendered in favor of complainant for §2,022 75-100 and costs; and the Clerk and Master was ordered to sell the land described in the bill, and attached in the progress of the cause. The Master afterwards reported that he had failed to make sale; and at this stage of the cause, being on the 15th of August, 1866, a petition was filed in the Chancery Court at Carthage, where the original suit was pending, by Larkin Page, and seven others, representing that they are the heirs at law of Henry Page, deceased, that he died at Nashville in October, 1864; and setting forth such satisfactory causes for not having made defense to the suit, that on the 21st day of August, 1866, *656 the Chancellor pronounced a decree setting aside the judgment pro confesso and the order for the sale of the land, and giving petitioners leave to become parties defendant, and to file an answer to the original bill. To this action of the court complainant excepted.
On the 3rd day of December, 1866, an answer and cross bill was filed in the names of Dilly Page (who is described in the petition as an heir, but in tlie answer and cross bill as the widow of Henry Page) and others, claiming to be his heirs, in which it is alleged that they are the widow, children, grand-children, and husbands of children, of the said Henry Page, deceased; that they were emancipated by the President's proclamation} that they are entitled to the property of Henry Page by virtue of the “Civil Eights Bill;” that the said Henry had left the country in consequence of great political excitement and because of an apprehension that he and his family would be reduced to slavery, and not for the purpose of avoiding the payment of his just debts; that he at first went to Cincinnati, but afterwards returned to and died in Nashville; that most of respondents lived in Smith county, and part of them on the lands owned by Henry Page; that Henry had made various payments to complainant, and was not indebted to the amount claimed in the bill; that he owned three tracts of land, of six, seven and one hundred and ninety-six acres in Smith county, and was the equitable owner of about one hundred and twelve acres adjoining the last mentioned tract; that Dilly intermarried with Henry in 1825; that the other defendants are their children and grand-children; that the *657 said Billy is entitled to dower; and they pray for assignment of dower, and all such, further and different relief as they may be entitled to.
The cross bill was fully answered by W. B. Andrews, the defendant. It was shown in evidence that he was the owner of the slaves, Bill, Brit and Billy, in the year 1857; that he sold them to Harry Page, the husband and father, for $3,200; that a settlement was made between Andrews and Harry in 1859, when it appeared that about one-half of the debt had been paid; 'that Harry was killed at Nashville, in a saw mill, in 1864; that he and Dilly had lived together as husband and wife for fifteen years, and were so recognized by the neighbors; that they were so living together at the time of his death, and were the parents of eleven children. Gabriel Bedford, a colored witness, aged seventy-nine years, states that he knew Harry and Billy before they were married; that they were married nearly sixty years before his deposition was taken; that they were married “like other darkeys did in those days;” that they were slaves at the time of their marriage, but were “regarded as man and wife all the time by their neighbors.” This witness also proved the number and names of their children.
This is the substance of all the evidence in the cause. The Chancellor heard the cause at October Term, 1868, and pronounced a decree in favor .of the original complainant for the amount of his debt and costs; dismissed the cross bill, and ordered a sale of the property attached. He declared that Billy was not a free woman at the death of Henry Page, in such a sense as to be en *658 titled to dower at the time of Harry's death, and that Harry left no legal heirs capable of inheriting the estate. Dilly presented a petition for rehearing, in which she alleged that Harry had not purchased her for the purpose of making her his slave, but as a wife, and to make her a free woman; that she was to aid in the payment of the purchase money; fully performed her part of the agreement, and thus acquired a right to freedom at the date of the purchase. The Chancellor refused to rehear the cause, and to grant leave to amend the cross bill, so as to put in issue the allegations of the petition.
From this decree Dilly Page p/ayed an appeal, which was granted by the Chancellor on her taking the oath prescribed by law for poor persons, which was done accordingly. This cause has been very carefully investigated by counsel, and fully argued before us; but we feel constrained, after a careful consideration of the numerous authorities cited on both sides, to hold that there is error in the Chancellor’s decree.
The rights of the parties can not be determined upon the constitution and laws as they now exist, but are to be ascertained under the constitution and laws as they existed in this State at the time of the death of Henry Page, in 1864. The emancipation proclamation, issued by Mr. Lincoln on the 1st day of January, 1863, had no effect in this State, because Tennessee was not one of the States embraced in it, as was held in Gholson v. Blackman, 4 Cold., 586, 587. That case might also have rested upon the broader and firmer ground, that the President of the United States had no constitutional authority to issue the proclamation, and that it was *659 issued in direct violation of the Constitution of the United States, which was then universally understoood as legalizing slavery in the States where it existed, as well as of the joint resolution adopted by Congress on the 25th of July, 1861, which disavowed all purpose of interfering with the rights or established institutions of the States in rebellion. See McPherson’s History of the Rebellion, 286.
But it is needless to pursue this discussion, or to consider the 13th Amendment to the Constitution of the United States, which was intended to effect what had not been accomplished, either by the Proclamation or the results of the civil war; or to express any opinion as to the validity of the amendment itself; or of the amended Constitution of Tennessee of 1865, as the existence of slavery in this State was annihilated beyond all doubt or question, by the Constitution of 1870, which was freely and voluntarily adopted by the people.
It was repeatedly held by our immediate predecessors, that slavery in this State was abolished, by the amended constitution of 1865: See Nelson v. Smithpeters, 2 Cold., 14; Graves v. Keaton, 3 Cold., 14; Gholson v. Blackman, 4 Cold., 587; Wharton v. The State, 5 Cold., 3, 4; Keith v. The State, Ibid, 38; Bedford v. Williams, Ibid, 210. There is nothing in the case now before us which requires a review, or reconsideration of those cases, as Dilly, from the evidence was vested with the inchoate right to freedom when she was purchased in 1857, by Harry, claiming to be her husband; and the amended constitution of 1865, however informally and irregularly adopted, *660 was recognized by the political department of the Government, viz.: the President and Congress of the United States. See Luther v. Borden, 7 How., 1, which applies to the recognition of a State Constitution.
While the institution of slavery existed, it was generally held, in the slaveholding States, that the marriage of slaves was utterly null and void; because of the paramount ownership in them as property, their incapacity to make a contract, and the incompatability of the duties and obligations of husband and wife with the relation of slavery: State v. Samuel, 2 Dev. & Bat., 177; Howard v. Howard, 6 Jones, 235; Smith v. State, 9 Ala., 990; Malinda v. Gardner, 24 Ala., 719; Bish. on Mar. & Div., 4th ed., §§ 156, 157. But we are not aware that this doctrine ever was distinctly and explicitly recognized in this State. Before the unjust, unwarrantable, unconstitutional, and impertinent interference, of enthusiasts and intermedlers in other States with this domestic relation, rendered it necessary for the State to guard against the effect of their incendiary publications, and to tighten the bonds of slavery by defensive legislation, against persistent and untiring efforts to produce insurrection, the uniform course of decision in this State was shaped with a view to ameliorate the condition of the slave, and to protect him against the tyranny or cruelty of the master and all other persons. Wantonly to beat or abuse* the slave of another, was indictable under the act of 1813, c. 56, Car. & Nic., 678. If indicted for a capital offense, and the master failed to employ counsel, it was the duty of the court to assign counsel for his defense at the expense of the master, *661 by act of 1835, c. 19, Car. & Nic., 683. If employed in the master’s business in apparel so tattered and torn as indecently to expose the person, the master was indictable for lewdness: Britain v. State, 3 Hum., 203, 204. Slaves could be witnesses for and against each other, as well as for and against free persons of color, under the act of 1839, c. 7, Nic. Sup., 131; Code, 3808, 3809.
The willful murder of a slave, whether committed by the master or any other person, was punishable in the same manner as the like offense against a white person was punishable: Act of 1799, c. 9, s. 1, Car. & Nic., 676, 677; Act of 1829, c. 23, s. 2; Ibid, 316; Code, 4597.
Our' Courts of Chancery often interfered to prevent their sale or removal, on the ground that “they constituted a part of the family entitled to and receiving, if worthy, the affections of the master,” and because “'the property in them was a property in intellectual and moral and social qualities; in skill, in fidelity, in gratitude, as well as in their capacity for labor.” See Loftin v. Espy, 4 Yer., 92; Henderson v. Vaulx and wife, 10 Yer., 38. Our courts of law were ever ready to secure their kind treatment by giving damages against the hirer for bad usage, cruelty, or negligence. See Dement v. Scott, 2 Head, 367; Huggins v. Ransom, 3 Head, 426; Traynor v. Johnson, Ibid, 44. A most enlightened and liberal construction was at all times given to the statutes which authorized emancipation, and to every species of contract or agreement on that subject. See the statutes and cases cited in 1 Meigs Dig., 454, 459, and especially *662 the cases of Harris v. Clarissa, 6 Yer., 240; Fisher’s Negroes v. Dabbs, 6 Yer., 157; Hartsell v. George, 3 Hum., 255; Greenlow v. Rawlings, Ibid, 90; Hope v. Johnson, 2 Yer., 123; David v. Bridgman, 2 Yer., 557; Jacob v. Sharp, Meigs, 114; John v. Tate, 7 Hum., 388; Elias v. Smith, 6 Hum., 33; Hinldin v. Hamilton, 3 Hum., 569; Lewis v. Simonton, 8 Hum., 185; James v. The State, 9 Hum., 308; Isaac v. McGill, Ibid, 616; Jane v. Hagan, 10 Hum., 332; Lewis v. Daniel, 10 Hum., 305; Jones v. Arterburn, 11 Hum., 97; Ford v. Ford, 7 Hum., 92, & S. C., 11 Hum., 89; Boon v. Lancaster, 1 Sneed, 507; Abram v. Johnson, 1 Head, 120; Jones v. Allen, Ib., 626; McCloud v. Chiles, 1 Cold., 248; Porter v. Blakemore, 2 Cold., 556; Stephenson v. Harrison, 3 Head, 732, 733.
The numerous authorities above cited, show that slaves, although regarded as property and subject to many restrictions, never were considered by the courts of this State as standing on the same footing as horses, cattle, and other personal property. Their condition was aptly and truly described by Judge McKinney, in Jones v. Allen, 1 Head, 626. He says: “We are not to forget, nor are we to suppose, that it was lost sight of by the Legislature, that, under our modified system of slavery, slaves are not mere chattels, but are regarded in the twofold character of persons and property; that, as persons, they are considered by our laws as accountable moral agents, possessed of the power of volition and locomotion, and that certain rights have been conferred upon them, by positive law and judicial determination; and other privileges and indulgences have been conceded to them *663 by tbe universal consent of tlreir ownérs. By uniform and universal usage, they are constituted the agents of their owners, and are sent on their business without written authority; and in like manner they are sent to perform those neighborly good offices common in every community. They are not at all times in the service of their owners, and are allowed, by universal sufference, at night, on Sundays, holidays, and other occasions, to go abroad, to attend church, to visit those to whom they are related by nature, though the relation be not recognized by municipal law; and to exercise other innocent enjoyments, without its ever entering the mind of any good citizen to demand written authority of them. The simple truth is, such indulgences have been so long and so uniformly tolerated, that public sentiment upon the subject has acquired almost the force of positive law:” Ibid, 636, 637.
In the case of Elias v. Smith, 6 Hum., 33, where Elias had purchased his wife and child, and other children were born to them after the purchase; where he was clothed with the mere form of a legal title, to the end that he might be able to emancipate them; where a creditor of Elias had caused his execution to be levied upon the wife and children, and he filed a bill to enjoin the sale, Judge Reese, in delivering the opinion of the court, says: that the former owners, who intended their email' cipation, “trusted, and not rashly, to the heart of the husband and father;” and, horror-struck at the thought that the wife and children could, under such circumstances, be treated as property, he indignantly inquires: “If Elias, stifling the voice of nature, and severing *664 the paternal tie, bad been such a barbarian and monster as to have meditated the sale of them, for his pecuniary advantage, upon the strength of his mere legal title, is there a Chancery Court in Christendom, having jurisdiction over such a trust, which would not have promptly interposed, at their instance, and enjoined him from perpetrating against them so flagrant a wrong? And will not such a court interpose in a case little short in its enormity of that supposed, when a creditor of Elias seeks to produce the same result by an execution sale at law? Certainly it would. That much we have the power, and it is our duty to do:” 6 Hum., 35.
These cases tend to show that the relation of husband and wife between slaves, was recognized by the courts of this State; and so far as we have knowledge of the practice before Justices who, for a long period, had jurisdiction under our statutes, to try slaves for offenses not capital, the uniform rule was to exclude husband and wife from being witnesses for or against each other, just as white persons maintaining the'same relations, were then excluded. By the Constitution of 1796, the laws then in force and use in North Carolina, were to continue in force in Tennessee until repealed; and by the North Carolina acts of 1715, c. 31, s. 6, and 1778, c. 5, s. 1, the common law of England, with certain exceptions, not material to be here noticed, was declared in force. And in the act of 1741, c. 1, s. 7, Car. & Nich., 450, it was declared, in substance, that no minister, or Justice of the Peace, should celebrate the rites of matrimony between servants, or between a free person and a servant, without the consent of the master or mistress, and every servant *665 married without such consent, was required to serve tbe master or mistress “one whole year after the term of service by indenture or custom, is expired.”
It is difficult at this day, to determine in what sense the term “servant” was employed, or to ascertain the custom referred to in the statute, but it is certain that while slavery existed in this State, slaves were not married to each other without the consent of their owners, as a general rule. By the act of 1787, c. 6, s. 3, a free negro, or a mulatto, was prohibited, under a penalty, from intermarrying with a slave, “without the consent of his or her master, had in writing.” These statutes go far to prove that the relation of husband and wife, between slaves, Avas a relation recognized by their owners; and the fact is notorious, that Christian masters and mistresses often consented to, and were present at, the celebration of marriages between their slaves, and that the ceremony was frequently performed by white ministers, as well as by ministers of their own color. The marriage act of 1778, c. 7, Car. & Nic., 450, authorized ministers of the gospel and Justices of the Peace to celebrate the rites of matrimony between “any two persons,” upon license or after publication of banns, without limitation as to race or color, and no good reason is perceived why, as slaves were always treated as persons, the language of that statute was not broad enough to include a marriage between slaves. A bond of but little practical utility was required, but that could have been signed by the master.
¥e are not aware that there Avas any general prevailing custom to marry slaves according to the requirements of this statute. The marriages between them were often *666 made by contract, as at common law, as they were often made between white persons in the early settlement of the country, and in remote districts where ministers and Justices were not always accessible. The issue of a free woman of color followed the condition of the mother, and was born free, and this principle was carried so far, that Avhere a female slave was to be emancipated, by the concession of the master, and assent of the State, but was to be held subject to service for a definite time, and a child was born to her after such emancipation, but during her subjection to service, it was held that the child was free born: Hartsell v. George,, 3 Hum., 255; Edwards v. McConnell, Cooke, 313, Cooper’s ed., 237.
These cases, and other cases previously cited, establish beyond controversy, that there were circumstances under which the courts of this State recognized the relation of husband and wife, and the ties of consanguinity, as existing among slaves, as well as among free persons, and free persons of color; and we hold, that a marriage between slaves, with the assent of their owners, whether contracted in common law form, or celebrated under the statute, always was a valid marriage in this State, and that the issue of such marriages were not illegitimates. Ve do not hold that such marriages were followed by all the legal consequences, resulting from the marriage of white persons. From the very nature of the institution of slavery, they could be determined at the will of the owners, and the laws of inheritance were not applicable to them, for the reason that slaves could not, in a legal sense, become the owners of property; but still this marriage relation, however restricted, might, and often did, *667 become the foundation of legal and equitable rights of the highest importance.
The facts of this case do not demand a review of the doctrine asserted in Bashaw v. The State, 1 Yer., 177; Grisham & Ligan v. The State, 2 Yer., 589, and other cases holding that the common law mode of celebrating a marriage between white persons is of no validity in this State; and that a marriage in this State could not be valid unless performed according to the act of 1778, c. 7, Car. & Nichv 450, or the previous act of 1741, c. 1; lb., 449. There is nothing in either of those statutes which expressly annuls or prohibits marriages in the common law form, and as the common law had been adopted, also by statute, the two statutes should have been, in our opinion, so construed as to authorize a marriage in either mode. It was correctly said in McCorry v. King’s Heirs, 3 Hum., 273, that “the whole body of common law, on the subject of the domestic relations, and especially the relation of baron and feme, except so far as changed and modified by statute, has been adopted among us;” and it is manifest that Judge McKinney doubted the authority of the cases in 1 and 2 Yer., from the observations made by him in Johnson v. Johnson, 1 Cold., 630.
We do not concur in the view expressed in McReynolds v. The State, 5 Cold., 20, that “the municipal law did not recognize the right of marriage between slaves;” but that opinion is unquestionably correct in holding, that if such marriages were illegal, they were made valid by the parties consenting to live and cohabit together after their emancipation, and that their so living and cohabiting together was “a legal assent to and ratification of the *668 marriage.” The Act of May 26, 1866, s. 5, declares, “that all free persons of color, who were living together as husband and wife, in this State, while in a state of slavery, are hereby declared to be man and wife, and their children legitimately entitled to an inheritance in any property heretofore acquired, or that may be hereafter acquired, by said parents, to as full an extent as white children are entitled under existing laws of the State.” An act similar in principle to this, had been passed some years before, to validate marriages between white persons who had been married under license carelessly issued in blank by the clerks, and containing nothing beyond their own signatures: See Acts 1849-50, p. 397.
The power to legitimate children has been frequently exercised by the Legislature, at the instance of the father, and was delegated to the Circuit and County Courts by the act of 1805, c. 2, Car. & Nic., 499. It may be still exercised under the Code, §§ 3640, 3643. These statutes, when not interfering with vested rights, have always been permitted to have a retrospective operation. See Cooly on Lim., 372, 373, 360, 361.
The act of 1866, having been passed to ratify marriages, good, during the institution of slavery, by the prevailing usage of this State, and to create a right of inheritance conformable to such usage, and the changed condition of the slave, was in furtherance of good morals, and of the best interests of the State; and where no other rights have intervened, was eminently constitutional and proper.
*669 In Reeve’s Dom. Rel., 3d ed., 310, it is said that the common law did not consider marriages celebrated irregularly as void; and in a note by the editors, page 311, it is said: “In North Carolina, by statute, and in Tennessee, by judicial decision, a marriage not solemnized according to the existing laws before some competent person, is held to be illegal and void in respect to a prosecution for bigamy: Statutes N. C., 1715, 1741, 1778; Bashaw v. Tennessee, 1 Yer., 117; but it may be doubted whether they would extend the doctrine so far as to bastardize the issue of the marriage.” It may be added in regard to the general subject considered in this opinion, that a recent author says: “That the English Parliament, by virtue of its transcendent power, may render a bastard legitimate and capable of inheriting. This same power has been claimed by the Legislatures of the United States, and except so far as Legislative acts may come under constitutional restraints against impairing the obligation of contracts, there seems no reason why they should not be uniformly upheld:” Schouler’s Dom. Rel., 312. The same author remarks further, in another part of his treatise, that, “Race, color and social rank, do not appear to constitute an impediment to marriage at common law, nor is any such impediment now recognized in England. But by local statutes in some of the United States, intermarriage has been discouraged between persons of the negro, indian and white races. 'With the recent extinction of slavery, many of these laws have passed into oblivion, together with such as refused to allow to persons held in bondage the rights of husband and wife.
The thirteenth article of amendment to the Con *670 stitution, gives Congress the power to enforce the abolition of slavery by appropriate legislation. As to persons formerly slaves, there are no acts of Congress which legitimate their past cohabitation, and enable them to drop the fetters of concubinage:” Ibid, 28, 29.
As it is probable in consequence of the extinction of slavery, that few cases growing out of that relation will arise hereafter, we abstain from the further discussion of the matters which have been considered, and from presenting an elaborate view of the other interesting questions which arise upon the record and have been urged in- argument. On the whole case, it is our opinion, and we adjudge the law to be as follows: viz:
1.That Dilly was the lawful wife of Henry Page, the assent of the owner to the marriage and the marriage itself being established by their long cohabitation, and recognition of each other as husband and wife.
2. That, the issue born of that marriage were born in lawful wedlock, and were rendered capable of inheriting property by the Act of 1866.
3. That, in accordance with a long and uniform course of decision in this State, when Hilly and her two children were purchased by her husband, in December, 1857, she acquired an inchoate right to freedom, which needed nothing to perfect it but the assent of the State; that this assent has been effectually given by general emancipation; and that her rights as a free woman thereby relate back to the date of her purchase, and place her in the same condition as if she had then been a free woman.
4. That there is no difference between her right to *671 dower • and the right provided by the general laws; that it is to be preferred to the right of creditors of her husband, and of course, to the right of complainant, and extends as well to the lands of which her husband was equitable, as legal owner.
5. That, after her dower is assigned, the residue of lands attached, including the interest in remainder, or so much thereof as may be necessary, shall be sold for the satisfaction of complainant’s claims subject to the right of redemption.
6. That, if any part of the land shall remain unsold, the title thereto shall be vested in the children, and those representing them, of Henry and Hilly Page.
Let the decree of the Chancellor be reversed at the cost of the complainant, and remand the cause for the execution of this decree.